[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. The Dissolution of the Marriage
It is found that all of the allegations of plaintiff's complaint have been proven, that the marriage has broken down irretrievably and the marriage is ordered dissolved for that reason.
I A Brief History of the Trial
This originally scheduled six-day trial began as planned on May 22, 1995, continued on May 23, 24 and 25, recessed thereafter until June 13 so that other previously scheduled matters could be disposed of, but as so often happens did not conclude on June 14. The trial continued again on June 19 and 20, resumed again on the next available court date, July 24, recessed again until July 28 so that another scheduled dissolution matter might be heard and finally concluded with final argument on August 1.
The task of the court in "carefully crafting a mosaic" is not made easier when estimates concerning the length of trial are not reasonably accurate.
III. The Construction of the Stipulation of October 13, 1993
By stipulation dated October 13, 1993 both parties, together with their counsel, signed the following agreement:
"STIPULATION FOR DISPOSITION OF HATTERAS MOTOR YACHT
The parties in the above-encaptioned matter respectfully stipulate as to the disposition of their 65' Hatteras motor yacht, hereinafter referred to as "yacht", as follows: CT Page 10873
1. The yacht shall be taken by the defendant to Florida as soon as reasonable for purposes of placing the yacht with a broker for sale.
2. The defendant shall be totally responsible for all of the costs of the transport of the yacht and any costs attributable to the sale of said yacht as well as any other outstanding expenses from the utilization or use of said yacht in the past.
3. The defendant shall give to the plaintiff the sum of $325,000 on or before March 1, 1994 or upon the sale of said yacht, whichever sooner occurs.
4. The defendant at his option shall have the ultimate power to decide upon the sale of the boat at the amount of the sale or whether it should be sold. The division of this asset in this manner is agreed to and stipulated by the parties and shall not be considered by them or the Court as an asset to be further divided in any way between them.
5. It is specifically understood and agreed to by the parties that the other assets of the parties or the rendering of orders for alimony or any other financial orders as of this time are still to be determined by the Court or yet to be agreed to by the parties."
Following the execution of this agreement defendant sailed the boat to Florida where he ultimately sold it for the sum of $794,000. From that amount he paid plaintiff the sum of $325,000, purchased a new boat for $334,000 and, using his old Porsche valued at $10,000 as a down payment, purchased a new one for an additional $30,000.
The parties now disagree as to the manner in which this transaction should be considered by the court.
Defendant quite simply contends that there should be no further division, credits or debits to either party relative to the boat proceeds distribution. Plaintiff's position is not quite so plainly expressed. She notes that the stipulation "fails to address any prohibition on the court's authority to consider this division when dividing the remainder of the assets" and reasons therefrom that "it was the intent of the parties . . . to only limit the court's CT Page 10874 authority to divide this particular marital asset and not to limit in any way this court's authority and power to consider this division in determining the division of the remaining marital assets."
In reaching its conclusion upholding the viewpoint of defendant, the court notes the following black letter rules of contract law: First — "contractual terms are to be given their ordinary meaning, and when the intention conveyed is clear and unambiguous, there is no need for construction."Gino's Pizza of East Hartford Inc. v. Kaplan, 193 Conn. 135,138 (1984). Second — "the circumstances surrounding the making of a contract, the purposes which the parties sought to accomplish and their motives cannot have an intent contrary to the plain meaning of the language used. Zullo v. Smith,179 Conn. 596, 601 (1980).
The stipulation is clear and unambiguous in stating that the agreed upon division of the boat sale proceeds was not to be considered an asset to be further divided by the parties (emphasis added). To interpret this plain, uncomplicated sentence in the manner suggested by plaintiff would serve only to provide a convoluted construction to incomplex phraseology.
This court concludes that the sum of $296,234 remaining from plaintiff's share of the boat proceeds, together with defendant's 40' Tiara boat presently valued at $250,000 shall be excluded from the marital estate of the parties on hand for distribution. In addition, the sum of $30,000 (representing additional boat proceeds) shall be deducted from the value of defendant's Porsche, leaving an adjusted value of $10,000 for distribution purposes.
IV. The Accident Settlement
Derrick, the thirteen-year old son of the parties, died as a result of a car accident in August, 1986. A settlement in the amount of $600,000 was obtained the following year. Plaintiff's testimony on this subject was understandably brief. Defendant's testimony was also quite limited, he indicating that the net proceeds were expended for the purchase of a new home and boat without objection on plaintiff's part. Neither probate records nor any other legal documents customarily associated with such a serious civil matter were introduced by either party. CT Page 10875
The subject appeared to be a non-issue until plaintiff, in her supplemental proposed orders, requested that she receive 40 percent of said sum of $600,000 within 90 days from date of judgment.
On the basis of the extremely minute evidence on this subject presently before the court, it finds that any net proceeds from said settlement were expended for family purposes and are included in the present marital estate on hand for distribution.
V. The Resolution of Disputed Values of Real Estate
Dean C. Amidon, a commercial real estate appraiser since 1980, testified on behalf of the plaintiff concerning the fair market value of several parcels of real estate owned by the defendant. He has held an M.A.I. designation since 1990, has done twenty appraisals a month for the past ten years, has completed appraisals for all the major insurance companies and was found to be an expert in his field.
Peter R. Marsele, also a qualified real estate appraiser who has appeared before this court on countless past occasions, testified on behalf of the defendant as to the fair market value of his various real estate holdings.
David Walsh, also a qualified real estate appraiser who had appraised several parcels of defendant's real estate on behalf of the plaintiff in March, 1994, was also called to testify by defendant's counsel.
The opinions of the above appraisers relating to the various parcels owned by defendant and the conclusions of the court on each are set forth in detail as follows:
A. #47 Main Street, New Britain, CT.
This parcel contains 0.489 acres near the center of New Britain on which is located a one story brick building containing 12,540 square feet of usable space on the first floor and a similar amount in the full finished basement.
Mr. Amidon, plaintiff's appraiser, employed all three traditional methods, i.e. cost, direct sales and income in CT Page 10876 conducting his evaluation but gave the most weight to the direct sales comparison approach because the building was owner-occupied. His four comparables included two properties on Market Square, Newington, CT., as well as two New Britain comparables. He valued the property at $770,000.
Mr. Marsele, in conducting his appraisal for the defendant, concluded that the cost approach was the most reliable because the building was more costly than the land and was owner-occupied. He was highly critical of Mr. Amidon, condemning his use of Newington comparables because "Newington and New Britain are different animals." He also pointed out that Mr. Amidon had failed to use depreciation in establishing his capitalization rate when employing the income approach to valuation. He valued the property at $590,000 as of the day he testified.
Mr. Walsh, in testifying concerning this property, stated that he too was aware of two sales in Market Square, Newington but did not use them because "Market Square sales are much higher than New Britain sales on a square foot basis. There are more vacancies in New Britain."
B. #526 Silas Deane Highway, Wethersfield, CT.
This court gives greater weight to the testimony of Mr. Marsele and establishes the present fair market value of the property at $624,000.
This property contains about 100 feet of frontage on Silas Deane Highway and includes 0.344 acres of land on which is located a one story block and brick retail building containing a gross leasable area of 1944 square feet. There is a pronounced downward slope to the property as one approaches the basement area in the rear of the property.
Mr. Amidon in his appraisal gave more weight to the direct sales comparison approach because the building was owner-occupied, and he valued the property at $175,000.
Mr. Marsele, defendant's appraiser, employed the income approach because he considered the land to be more valuable than the building. He established the fair market value of the property at $150,000. CT Page 10877
Both appraisers presented reasonable explanations for their findings. The court determines the present fair market value of the property to be $162,500.
C. #219 Main Street, Northampton, Mass.
This property consists of 0.029 acres of land with 17.7 feet of frontage and no on-site parking situated on Main Street, Northampton, Mass. and on which is located a three-story brick building containing about 3675 square feet of gross building area.
Mr. Amidon did not employ the cost approach because "to estimate accrued depreciation would be speculative." He also discarded the sales comparison approach because "we couldn't find any sales we thought comparable." Instead he used the income capitalization approach and, with a capitalization rate of 11 percent, established the fair market value of the property at $240,000.
Mr. Marsele agreed with Mr. Amidon to the extent that he too found that "the income approach is the only approach applicable." Here again, however, Mr. Marsele was critical of Mr. Amidon for failure to use depreciation in establishing he "cap" rate. Mr. Marsele employed a capitalization rate of 13 percent which included depreciation and found the present fair market value of the property to be $170,000.
The court found the testimony of Mr. Marsele to be more persuasive and establishes the present fair market value of the property at $184,000.
V. The Marital Estate of the Parties
Plaintiff (wife)
No. 4 Morgan Place, Avon, CT. Total Value $190,000 Less Mortgage 77,000 --------- Equity $113,000 $113,000 1995 Toyota Camry 14,458 Household Furniture, etc. — Jewelry 9,500 Fleet Checking Account 668 Fleet I.R.A. 22,242 Fleet I.R.A. 11,324 Fleet Bank (balance of $325,000 obtained through sale of yacht-see Article III supra $296,234) — ------- Total $171,192 CT Page 10878
Defendant (husband)
No. 149 Tunxis Village, Farmington, CT. Total Value $158,000 Less Mortgage 132,000 ------- Equity $ 26,000 $ 26,000
No. 47 Main Street, New Britain CT Total Value $624,000 Less Mortgage 620,000 ------- Equity 4,000 4,000
No. 538 Silas Deane Highway, Wethersfield, CT. Total Value $162,500
No. 219 Main Street, Northampton, Mass. Total Value $184,000
1995 Porsche (adjusted value) 10,000
Household Furniture, etc. —
MidConn Bank — 3 accounts 4,100
2 Rolex Watches 7,300
Camera Shop of New Britain 196,000
Life Insurance (Manuf. Life F.V. $25,000 C.S.V $6,800)* — (Nat. VT. F.V. $10,000 C.S.V $2,500)* —
I.R.A. Fleet Bank 148,000 CT Page 10879
40' Tiara boat (see Article III supra $250,000) —
I.R.S. 1994 Tax Return 8,000 ------- Total $749,900
Total Marital Estate $921,092
VII. The Review and Evaluation of the Evidence in Accordance with the Provisions of Sec. 46b-81c C.G.S.
The plaintiff wife, who is presently forty-seven years of age, and the defendant husband, who is forty-eight years old, were married on September 20, 1970, almost twenty-five years ago. They have two children, a son Brian, now nineteen years of age and presently commencing his sophomore year at New Hampshire College, and a son Jeffrey, who turned fifteen on August 12, 1995. Jeffrey had been attending Avon Old Farms, a private school, but plans to enter Avon High School as a sophomore this September. An older son, Derrick, died as a result of an automobile accident in 1986 at the age of thirteen.
The parties first met at Bryant College in Providence, Rhode Island which they were both attending. The defendant graduated from there where he had majored in accounting, and plaintiff from nearby Rhode Island College with a B.A. degree in sociology.
Following their marriage in 1970 the parties lived in New Britain until 1975 when they moved to a home they had purchased in Avon. Defendant devoted most of his time to the family camera business with continued success while plaintiff cheerfully accepted responsibility for running the home. In her words, "I enjoyed doing what I had to do." In summer time in the early years the family rented a cottage at the beach for a month. As time went on defendant purchased a series of boats, each seemingly larger than its predecessor. During the summer the family would enjoy the boat on Long Island Sound and during winter periods would spend time on it in Florida CT Page 10880 where it was berthed. Defendant at one time or another during these years drove a Mercedes, a Porsche or a Corvette while plaintiff operated a Lexus or Toyota Camry. They enjoyed cruises to the Mediterranean and Caribbean and visited such interesting and off the beaten path places as Singapore, Thailand, Bangkok, Hong Kong and Tahiti. Expensive gifts were exchanged between the parties. Plaintiff received such presents as a pear shaped diamond, a three carat diamond ring, Rolex watches, a blue sapphire and diamond bracelet, diamond-studded earrings, a sapphire ring and a mink coat. All in all, this account portrays, at least on the surface, a lifestyle that many might envy.
Meanwhile the camera business, under the skillful guidance of the defendant, continued to flourish. Where in 1970 there was one camera outlet, now there are twenty-five. While defendant's parents still control the voting stock of the company, the defendant for all intents and purposes is largely responsible for the high degree of success enjoyed by the business over the past twenty years.
From the birth of their first child in 1972 until the commencement of the present action in February 1993 plaintiff was exclusively occupied with the usual duties of a housewife and mother.
Defendant's current financial affidavit reflects a gross weekly income of $2,400 from his position as president of Camera Shop of New Britain, Inc. with a weekly net after the usual deductions of $1,363. In addition he has a weekly gross from rentals of $3,549 with a net of $1,148 after deductions for mortgage, utility and tax payments. His total net weekly income is indicated to be $2,511. CT Page 10881
Continuing on the subject of defendant's income, the court notes his salary from the Camera Shop for the following years:
1988 $196,890
1989 $197,080
1990 $156,821
1991 $201,178
1992 $205,891
1993 $133,694
1994 $124,800
The evidence indicates that the defendant started receiving $2,000 per week on March 12, 1993, approximately one month after plaintiff instituted this dissolution action. Defendant's explanation for the dramatic reduction in his salary was that "my pay was reduced after we got the tax returns from the accountant." When, on the other hand, the company made a profit in 1993 defendant stated that "I asked for a raise but didn't get one." It would appear that defendant's salary was not to any degree related to the profit or loss of his employer until the present action commenced.
Plaintiff presently is employed part-time as an office assistant for a photographer. She works fifteen hours a week, earning $7.40 per hour. Her financial affidavit reflects a gross weekly income of $111.00 with a weekly net after the usual deductions of $81.00. Concerning this employment plaintiff stated that "I file, number pictures, bring pictures to school. I'm a jack of all trades. The most hours I've worked is thirty. I haven't looked for any other work."
On the subject of her future employment plaintiff testified as follows: "I thought I might go back to work part-time when the kids were old enough. I never thought of a career working. I started working at twenty-two and thought I'd retire at sixty-five and travel or something. Son Jeff (age 15) comes first. He needs to be driven places. To further my career I'd have to go back to school and get my M.A. in social work. I plan to look into courses I could take in the future. I want to do some kind of employment when Jeff leaves high school. I'm going to start looking when the trial is over. I haven't done anything along this line for more than two years this case has been pending. In the past 27 months I've made one phone cal [call] in reference to a newspaper ad." It would appear that plaintiff has not felt a pressing need or made a concerted effort either to increase her present working hours or to seek more lucrative employment in another field. CT Page 10882
Fault
 Plaintiff's Viewpoint
Plaintiff testified that in September and October, 1973 defendant had an affair with a secretary in his company who had paid a lot of attention to him. Defendant moved out of the family home for two weeks and spent a weekend with her. Upon his return he was apologetic, stating it wouldn't happen again. Plaintiff said that she believed him, didn't want the marriage to end and accepted him back. The court has no reason to believe defendant was unfaithful to plaintiff thereafter until this action was commenced.
Plaintiff's complaints for the most part center upon defendant's control of the family finances, his many demands upon her, and his consuming interest in boats.
The flavor of plaintiff's testimony can be found in the following notes on her testimony made by the court:
"All he talked about with me was sex. He'd get angry if I wore a sweatshirt. He'd want me to greet him in some revealing outfit. He made me feel like an object — that I was his possession. I talked to him about this many times but he didn't change. Once a friend asked me to go to Block Island for a week. He said I couldn't go, that he wouldn't pay for a vacation when he had a boat I could stay on. He was neglectful of our wedding anniversary. One year he scheduled a seminar on telescopes on the night of our anniversary. Another time he left the day before to bring the boat to Florida. I felt as though our anniversary meant nothing to him."
Plaintiff further testified that during the period 1990-1992 she concluded that she no longer loved defendant. She stated that he seemed to question everything she did, that she dreaded seeing him come home at night, that she was constantly on guard, couldn't please him and stopped trying. She further remarked that she doubted herself, became depressed and felt she was useless as a human being. In her words, "I was just a possession he could control at will. I was petrified of him. I didn't like arguing. Everything was a confrontation. He refused to seek counselling with me, saying `If you have a problem, you deal with it.'" CT Page 10883
It was during this period, more particularly in May or June, 1992, that plaintiff began a relationship with one Don Marconi which later culminated in the institution of this dissolution action and the separation of the parties. A chance meeting developed into phone calls, some of which were interrupted by defendant, and still later to the discovery by defendant of a number of affectionate letters sent by Marconi to the plaintiff and hidden by her in a closet. In September, 1992 plaintiff agreed with defendant's suggestion that they explore counselling, they attended sessions for about a month but, in plaintiff's words, "I knew there wasn't anything left for me anymore. I thought I should give it a try but knew the marriage was over." Plaintiff instituted the present action in early February, 1992. After an interval of several months plaintiff renewed her relationship with Mr. Marconi. Defendant vacated the family home on April 15, 1993.
Defendant's Viewpoint
The following is a condensation of defendant's version of the events leading to the irretrievable breakdown of the marriage of the parties:
Defendant testified that the pivotal point in the marriage was the death of their young son in August, 1986. Before that time defendant described his wife as "a great cook — she did an excellent job. There's nothing she wouldn't do for the boys." He added that "there's been a change in her since then. There seems to be less purpose in her life. For the past three years she's been focused in a different direction. Her involvement with someone else took precedence over her kids." By way of admission of his own imperfections defendant stated that "some years ago when we were struggling I wasn't as attentive as I should be. I was no angel. It was a two-way street." Describing the closing months of their marriage, defendant state "I knew in September, 1992 that she wanted a divorce because it was all over between us. Before that time she complained I was controlling, inattentive, ungiving. I never felt I was number one in her life. When I'd suggest we'd go away alone on a weekend she'd say `no'. It got progressively worse. At first she enjoyed boating with me. As time went by she made excuses to be in other places. She always found other things to do." Defendant attributed the breakdown of the marriage principally to plaintiff's CT Page 10884 involvement with Mr. Marconi. Describing his reaction after being served with dissolution papers defendant testified that "I begged her not to pursue the action. Numerous evenings I was on my knees begging her to stop. She said it was too late. I didn't move out until April 15, 1993."
Since the commencement of this action defendant has had short term relationships with several women.
The court has thoroughly examined and weighed all of the evidence on the subject of cause for the breakdown of this marriage. It concludes that defendant's testimony is more credible and that fault for the irretrievable breakdown of the marriage rests primarily with plaintiff.
Other Factors
Both parties appear to be in reasonably good health.
The court is aware of plaintiff's contribution as a housewife and mother, but concludes on all the evidence that defendant made a greater contribution than did she in the acquisition, preservation or appreciation in value of the marital estate.
The liabilities of the parties are approximately the same. Concerning Brian's tuition at New Hampshire College, defendant paid $20,000 in tuition during his freshman year. Plaintiff testified that she expected defendant to pay Brian's future tuition. Defendant in turn stated he would pay the tuition with or without assistance from plaintiff.
Conclusion
After sifting through and weighing all of the evidence as it pertains to Sec. 46b-81c C.G.S. and after having given particular consideration to such predominating factors as the length of the marriage, the income and earning capacities of the parties, their comparative contributions to the marital estate, and responsibility for the breakdown of the marriage, this court concludes that the marital estate of the parties should be divided as follows:
Plaintiff 50 percent CT Page 10885
Defendant 50 percent
VIII. The Distribution of the Marital Estate in Accordance With the Findings Made in Article VII (supra)
Total Marital Estate $921,092
Plaintiff's Share 50% $460,546
Defendant's Share 50% $460,546
There is awarded to plaintiff the following:
No. 4 Morgan Place, Avon, CT. Total Value $190,000 Less Mortgage 77,000 ------- Equity $113,000 $113,000
1995 Toyota Camry 14,458
Household Furniture, etc. —
Jewelry 9,500
Fleet Checking Account 668
Fleet I.R.A. 22,242
Fleet I.R.A. 11,324
 Fleet Bank ($296,234-balance of plaintiff's share of boat sale proceeds) —
Defendant's I.R.A. 148,000
 Amount due Plaintiff from Defendant 141,354 -------- Total $460,546
There is awarded to Defendant the following:
 Equity in No. 149 Tunxis Village, Farmington, CT. $ 26,000
CT Page 10886
 Equity in No. 47 Main Street, New Britain, CT. 4,000
 Equity in No. 538 Silas Deane Highway, Wethersfield, CT. 162,500
 Equity in No. 219 Main Street, Northampton, Mass. 184,000
1995 Porsche (adjusted value) 10,000
Household Furniture, etc. _
MidConn Bank — 3 accounts 4,100
2 Rolex Watches 7,300
Camera Shop of New Britain, Inc. 196,000
Life Insurance (Manua Life) C.S.V $6,800 —
Life Insurance (Nat. VT) C.S.V. $2,500 —
40' Tiara Board — $250,000 —
 I.R.S. 1994 Tax Refund 8,000 -------- Total $601,900 Less Amount Due Plaintiff 141,354 --------- Balance Due Defendant $460,546
IX. Supplemental Orders Relating to the Distribution of the Marital Estate
A. Defendant is ordered to give plaintiff his promissory note in the amount of $141,354, which note shall bear interest at the rate of 6 percent per annum and shall be payable to plaintiff in manner and form as follows:
By the payment of $7,500 together with accrued interest three months from date hereof, and by the payment of a like sum of $7,500 together with accrued interest quarterly thereafter until June 19, 2000, at which time all then remaining balances of principal and interest shall be fully CT Page 10887 due and payable.
B. Said note shall be secured by a mortgage on defendant's real estate situated at No. 538 Silas Deane Highway, Wethersfield, CT, No. 149 Tunxis Village, Farmington, CT., and No. 47 Main Street, New Britain CT.
C. Each of the parties shall execute all documents necessary to carry out the orders of this court.
X. Orders Concerning the Plaintiff
A. Alimony
In issuing its orders on alimony the court notes the following: Plaintiff is presently working only 15 hours per week as an office assistant. While she testified her presence at home caring for her minor child limited her to this schedule, the child Jeffrey, age 15, has been residing with the defendant since April, 1995. In three years Jeffrey will have completed high school. Further, plaintiff, who has a B.A. degree in sociology, has expressed a desire to "return to school and get my M.A. in social work." Her present weekly expenses of $1,329 as listed on her current financial affidavit include food, clothing, vacations and sports activities for the minor child. Also noted is the disparity between defendant's stated income and that existing immediately prior to the commencement of this action.
After considering all of the evidence as it relates to Sec. 46b-82 C.G.S., including but not limited to the length of the marriage, almost twenty-five years, responsibility for its breakdown and the award which the court made pursuant to Sec. 46b-81c C.G.S., being mindful also that the parties have been separated for more than two years and that the defendant during that time has provided financially for the plaintiff and their children, the court orders that defendant pay alimony to the plaintiff as follows:
 1. The sum of $900 per week for a period of three years.
 2. The sum of $700 per week for a period of three years thereafter, and CT Page 10888
 3. The sum of $500 per week until March 4, 2010, at which time all payments of alimony shall terminate.
This order shall be nonmodifiable as to term only but shall sooner terminate upon the remarriage of the plaintiff, her cohabitation with an unrelated male within the meaning of the statute, or upon the death of either party.
B. Health Insurance
Defendant shall maintain health insurance for the plaintiff for the maximum period prescribed by law under the provisions of COBRA at plaintiff's cost and expense.
C. Life Insurance
Defendant shall maintain his existing life insurance policies in the total face amount of $35,000 with the plaintiff as irreversible beneficiary during such time as defendant shall be obligated in accordance with the terms of any financial order of this court. In this regard the court is mindful of the holding in Michel v. Michel, 31 Conn. App. 624
(1993).
D. Counsel Fees
Because of the various orders issued by the court, no award of counsel fees is made to either party.
E. Exchange of Federal Income Tax Returns
During such time as defendant is required to pay alimony or support, the parties shall annually, commencing April 15, 1996, exchange federal income tax returns.,
F. Liabilities
1. Bill of Stephen Vecchitto $4,986.60
 Plaintiff shall be responsible for $3,743.30 of said bill and defendant for the balance of $1,243.30.
2. Other Liabilities
CT Page 10889
Each of the parties shall be solely responsible for all other debts listed on his or her financial affidavit.
XI. Orders Concerning the Minor Child Jeffrey, Age 15
A. Custody
The parties shall have joint custody of the minor child Jeffrey with primary physical custody with the plaintiff. The defendant shall have reasonable rights of visitation.
B. Support
At the time of trial the minor child was residing with the defendant, and the court was uncertain how long this arrangement would continue. For that reason the court orders defendant to pay plaintiff as child support the sum of $300 per week during such time as the minor child resides with plaintiff. Defendant shall not be required to pay child support while the child is residing with him.
C. Income Tax Exemption
The defendant shall take the minor child Jeffrey as an exemption for federal and state income tax purposes providing he is current in his support payments.,
D. Health Insurance
The defendant shall maintain health insurance for the benefit of the minor child Jeffrey. The parties shall share equally all unreimbursed medical, dental, pharmaceutical, orthodontic and ophthalmological expenses. The provisions of Sec. 46b-84d C.G.S. shall apply.
E. Defendant's Motion for Modification of Custody and Support
On April 21, 1995 defendant filed with the court a motion for modification of existing orders concerning custody and support for the minor child Jeffrey. On June 13, 1995 the parties stipulated that the matter of custody be referred to family relations for mediation and/or study. CT Page 10890
After reviewing the evidence on the matter of support modification, the court orders that defendant pay plaintiff as support the sum of $50 per week during such time as Jeffrey shall have resided with defendant. This order shall be effective from the date of filing of this motion until the date of this decision.
John D. Brennan State Judge Referee